Filed 9/11/24  In re D.F. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re D.F., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>K.F. et al.,<br><br>Defendants and Appellants. | F087415<br><br>(Super. Ct. No. JD144100-00)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Christie Canales Norris, Judge.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant K.F.

Jesse Frederic Rodriguez and Giselle Marie Achecar, under appointment by the Court of Appeal, for Defendant and Appellant M.F.

Margo A. Raison, County Counsel, Judith M. Denny, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellants K.F. (mother) and M.F. (father) are the parents of the one-year-old child, D.F. (the child), who is the subject of this dependency case. Mother challenges the juvenile court's orders issued at a contested Welfare and Institutions Code[1] section 366.26 hearing that resulted in mother and father's parental rights being terminated. Mother contends the juvenile court erred when it declined to apply the beneficial parent-child relationship exception. Mother also argues that the juvenile court deprived her of due process by excluding relevant and favorable evidence. Father joins in mother's arguments.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

In December 2022, the Kern County Department of Human Services (department) initiated the present dependency proceedings after receiving a referral alleging the child, at two-months of age, was at risk of severe physical harm in the custody of father and mother due to severe physical abuse of the child's sibling, L.F. There was concern the child was at risk based on his older sibling's suffering of skull fractures, subdural hematomas, retinal hemorrhages, clavicle fractures, rib fractures, femur fractures, and chronic bruising to the face as an infant.

***The Sibling's Case***

The sibling's case came to the attention of the Arizona Department of Child Safety (DCS) on June 16, 2021, when then four-month-old L.F. was transported to the hospital by ambulance after he started having seizures and became unresponsive. Law enforcement responded to the hospital after receiving a report that L.F. had a life threatening brain bleed and skull fractures, which appeared to be the result of abuse. X-rays at the hospital revealed three skull fractures, a brain bleed, five rib fractures, bilateral

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Father asserts that if mother's challenge is successful, his parental rights must also be reinstated. (See California Rules of Court, rule 5.725(a)(1).)

clavicle fractures in different stages of healing, a "bucket handle" fracture of the right and left femur, fractured metatarsals in the right foot, and swelling in the spine.

Mother and father were interviewed by law enforcement during their investigation of suspected child abuse. The family recently moved to Arizona from another state because father was transferred by his employment. L.F. started going to daycare on Thursday, June 10, 2021, and he threw up at the daycare on Friday, June 11, 2021. On Saturday night, L.F. was up screaming all night due to constipation.

Mother picked L.F. up from the daycare on Monday, June 14, 2021, because he was vomiting. On that same date, daycare workers made reports of child abuse after observing bruising on L.F.'s face and bottom. Law enforcement and DCS did not observe any noticeable bruising when investigating on that date. Mother acknowledged that L.F. had a bruise and scratch on his bottom, but she did not know how they happened. Mother took L.F. to urgent care on Tuesday morning for his fever. Later in the afternoon, L.F. continued to have a fever and mother took him to the hospital. L.F. was sent home from the urgent care and the hospital with instructions to be given Tylenol.

On the afternoon of Wednesday, June 16, 2021, L.F. was feeling better and playing with his toys. The family went out for food that evening, and L.F. began to cry while they stood in line. Father took L.F. to their truck to change his diaper, and he noticed L.F. did not seem responsive as he laid him down. As father came back into the restaurant, he told mother that "something was not right with [L.F.]." Mother described L.F.'s breathing as labored and wheezing, and his eyes and head rolled back when father handed him to her. The parents called 911 and an ambulance transported L.F. to the hospital.

Mother suspected that L.F. was injured during his first day at the daycare. When informed that L.F. had older injuries, mother explained how she heard "popping sounds" while they held him under the armpits on a trip to Bakersfield in March of 2021. She also believed L.F. had brittle bones because she could not explain his fractures. Both

3.

parents also recalled an incident where L.F. bumped his face on father's cheek, which caused a bruise the week before he started daycare. Father claimed L.F. fell out of his hands while he was showering a week earlier, but he caught L.F. with his hands. He also believed L.F. hit his head on a door jamb, but he could not recall the exact date.

Neither parent could recall any incidents that could have caused L.F.'s fractures. However, mother had numerous photographs on her cell phone of bruises, bumps, and broken skin on various places of L.F.'s body and face on 11 dates from February 14, 2021, to June 2, 2021. The injuries included: bruises and scratches to the face and abdomen, bruising on the jugular notch, a bump, bruise and abrasion on his forehead at the hairline, minimal bruising under his eye, a blood spot under his tongue, a torn frenulum, and visible abrasions to his upper gums.

Law enforcement and DCS consulted with one of the doctors from L.F.'s "Child At Risk Evaluation" team. Dr. Woolridge was unable to date L.F.'s skull fracture, but the brain bleeds that were likely associated with the skull fracture were described as acute. One of L.F.'s clavicle fractures were older and the other was acute. L.F.'s rib fractures were noted as "the only clearly older fractures." L.F.'s right femur fracture was acute, and his foot fracture was "age indeterminate."

Dr. Woolridge had concerns that L.F.'s trauma was nonaccidental in nature. He concluded that L.F.'s head trauma likely occurred during the diaper change in the truck at the restaurant because he would have been symptomatic almost immediately after suffering the injury. Dr. Woolridge also suggested that the skull fracture to the back of L.F.'s head was caused by his head being hit against something with padding on it because there was no obvious external bruising on the back of his head.

Mother was arrested for failing to protect L.F. due to the past injuries and trying to dissuade the investigation by accusing daycare staff. On June 25, 2021, DCS filed a petition regarding L.F., and he was placed into protective custody on June 29, 2021. DCS

alleged that mother and father knew or reasonably should have known that another person caused L.F. to suffer a serious physical injury, and the Arizona court found that the allegations of the petitions were true.

On July 23, 2021, L.F. was placed with his maternal aunt and uncle in Bakersfield. Both parents entered a no contest plea, and L.F. was adjudicated as a dependent of the Arizona Superior Court in September 2021. In January 2022, DCS recommended that a plan of adoption be established for L.F. Both parents contested the adoption and requested a permanent plan of legal guardianship.

### The Child's Removal

On December 1, 2022, the department received a referral indicating father and mother had an open dependency case due to substantiated severe physical abuse of L.F. in Arizona. Mother moved to Kern County in September of 2022 and gave birth to the child in September 2022. Father continued to live in Arizona, but he traveled to Bakersfield regularly to visit L.F. Mother refused to answer the door when a social worker from the department made a visit to her home, and she declined to speak with the social worker.

The department social worker spoke to the investigating detective in Arizona and a DCS social worker regarding the circumstances surrounding L.F.'s injuries. The detective summarized their investigation of the June 2021 incident for the department social worker. The detective also reported that there was a previous incident in 2009, where the four-month-old child of a female friend sustained a skull fracture and brain bleed while in father's care. After the initial investigation of the four-month-old child's injuries, father apologized for lying to law enforcement in a letter. He claimed the other child hit his head on the headboard while his female friend was showering, and the female friend then found the child unresponsive. On December 7, 2022, the child was taken into protective custody pursuant to a warrant.

5.

The department filed an original petition alleging the child was described by section 300, subdivisions (a) and (j). The petition alleged the child was at substantial risk of suffering serious physical harm inflicted nonaccidentally by mother and father based upon the previous injuries to the child's sibling and the parents' inability to provide a reasonable explanation for the injuries.

The Arizona Superior Court declined jurisdiction pursuant to the Uniform Child Custody Jurisdiction Enforcement Act (UCCJEA) on December 14, 2022. At the conclusion of a contested detention hearing, the court ordered the child detained and set a combined jurisdiction and disposition hearing for February 1, 2023. Supervised visitation was ordered to occur twice per week for two hours between the parents and child.

The department's jurisdiction report recommended that the allegations in the original petition be found true. A contested jurisdiction hearing took place on March 27, 2023, after multiple continuances, and both mother and father testified. The juvenile court found all of the allegations of the petition true and continued the disposition hearing to April 11, 2023.

The department's disposition report recommended that both parents be denied services pursuant to section 361.5, subdivision (b)(6) and the setting of a section 366.26 hearing. The child was placed with a nonrelative extended family member in Bakersfield. He was developmentally on target for his age with no medical issues noted. Mother was living with her parents in Bakersfield, and father recently moved to Bakersfield.

Mother did not understand why the child was removed from her care, and both parents claimed inaccurate information was provided by DCS in Arizona. Father reported completion of two anger management classes, two parenting classes, and a psychological evaluation for L.F.'s case. Mother was participating in nurturing parenting

and child neglect, physical abuse as a perpetrator, and learning to protect classes. Mother and father were participating in supervised visits, and they interacted appropriately and affectionately with the child. Mother fed him formula from a bottle and walked him around the visitation room in her arms. She often shared hugs and kisses with the child during visitation.

L.F.'s social worker from DCS reported that neither parent had taken responsibility for L.F.'s injuries, but mother recently accepted that the injuries could have happened while he was in their care. According to the DCS social worker, four medical doctors testified during L.F.'s case indicating that L.F.'s injuries were consistent with nonaccidental trauma. The parents had no experts testify as to other potential causes during L.F.'s case. Both parents still believed L.F.'s injuries were caused by the daycare or mishandling by doctors at the hospital.

The department did not recommend reunification services for either parent because they had not taken responsibility for the severe physical abuse of L.F. or provided a plausible explanation for L.F.'s injuries. The report acknowledged that both parents established a bond with the child, but the department continued to believe that the parents' inability to explain the child's injuries placed the child at a continued risk of nonaccidental harm by the parents.

The contested disposition hearing began on May 11, 2023, with both mother and father present. The child's care provider testified that the child lived in her home since late December 2022. She also testified that the child recognized mother's voice during phone calls every day and appeared excited to visit with mother. The child was observed crying on occasion when mother placed him into the car seat after a visit. Both mother and the care provider were referred to as "mama" by the child. Mother provided supplies, clothes, and breast milk for the child as needed.

The aide responsible for supervising the parents' weekly visits testified that mother comforted the child appropriately and she did not have to intervene in mother's visits. Mother brought toys, books, and food to her visits. The child was responsive to mother's voice, and mother comforted him throughout the visitation. The aide believed one could tell that the child was happy and wanted to be around mother.

Mother testified that the child lived with her for the first two and a half months of his life prior to removal. She had participated in classes to improve her parenting in both Arizona and California. Her requests to progress her visitation beyond a visitation center were denied by the department. Mother and father were currently living together, and father was around the child on occasion for the first two months of his life.

Mother testified about the topics she was learning in her courses, and she applied the skills during her visitation. Mother's counsel asked her how she demonstrated what she learned to the department. Mother responded that, "at the beginning of this process, I provided visit notes from [L.F.], and they were disregarded. So that's why I'm still confused at how the Department would know how my parenting skills are, if they don't consider visitation reports."

On cross-examination, mother acknowledged photographing injuries on L.F. on several dates prior to his hospitalization. Mother had reviewed the various records from the sibling's case, and she was aware of a report of injuries to another child who was in father's care in 2009. She testified that neither her or father ever intentionally harmed L.F. Mother also testified that she "[had] not witnessed any reason to believe" that father injured L.F., and she had "only witnessed him as a safe person." Seeking further clarification, the juvenile court asked if it was possible that father could have been inappropriate with L.F. Mother responded, "I believe anything is possible."

8.

On May 24, 2023, the juvenile court allowed counsel to present argument before its ruling on the contested disposition. Mother's counsel requested that the juvenile court observe a visit between the child and mother prior to making its ruling. The juvenile court denied mother's request. After hearing argument from counsel, the juvenile court ordered the child removed from the parents' custody and denied family reunification services to both parents pursuant to section 361.5, subdivision (b)(6).[3] A section 366.26 hearing was set for September 21, 2023, and mother's visitation remained supervised at twice per week for two hours.

### Selection and Implementation Hearing

The section 366.26 report, dated September 11, 2023, recommended that mother and father's parental rights be terminated and a plan of adoption be ordered. The child, at 11 months old, had no noted health concerns and appeared to be developing appropriately for his age. He was recently placed in the home of his maternal aunt and L.F. on June 11, 2023. The maternal aunt was interested in adopting the child and L.F.

The report noted that mother continued to visit regularly with the child. She was appropriate and attentive during the visits, and she provided snacks and activities for the child. Mother showed affection for the child with hugs and kisses. The child slept in mother's arms, and he was comforted by mother when he cried. At the conclusion of visits mother kissed and passed the child to the care provider with no distress noted.

The social worker acknowledged that mother had consistently visited with the child. However, it was determined that the child likely viewed her as a friendly visitor due to the length of time that he had been out of her care. The department considered the parental relationship to be minimal, and it concluded that it would not be detrimental to terminate parental rights. The current relative care providers were observed to meet the

---

[3] Mother filed a petition for extraordinary writ relief challenging the juvenile court's order, which we denied. (*K.F. v. Superior Court*, (Aug. 17, 2023, F086322 [nonpub. opn.].)

9.

child's daily needs, and they expressed a full commitment to providing a permanent home for the child through adoption. The child looked to the relative care providers to meet his physical and emotional needs, and he was fully integrated into their family. The social worker noted that the child appeared to be calm, happy, and easily comforted by the relative care providers. He willingly went to them and smiled while he was in their arms.

A contested section 366.26 hearing was held on November 9, 2023. Mother and father were both present for the hearing. Mother's counsel requested that the court accept her offer of proof regarding her excuses for missed visits. The aide responsible for supervising six of mother's visits since August 2023 testified about her observations. The child appeared to be comfortable and happy with mother. There were no issues when the child was separated from mother or father at the end of visits.

Mother's counsel argued that severing mother's parental relationship would be harmful to the child, and she requested that the court refuse to terminate parental rights. Father's counsel also argued that his parental rights should not be terminated based upon the existence of a beneficial parent-child relationship. Counsel for the department and the child argued that the parents had not proven that an exception to adoption was applicable.

After hearing argument from all counsel, the juvenile court proceeded to its ruling on the beneficial relationship exception by acknowledging that mother visited consistently. The court described mother's visits as positive, and it explained that, "the parents obviously love their child very much, and the child enjoys the visits." However, it concluded that there was no evidence to show that there was a substantial, positive, emotional attachment between the child and either parent.

The court continued to examine the third prong of the parent-child relationship exception in the event that there was a substantial, positive, emotional attachment. The court acknowledged that it was not comparing the parents' attributes to the care provider

10.

or determining whether the parent could provide a home for the child. It concluded its analysis regarding the detriment of severing the parental relationship against the benefits of an adoptive home as follows:

> "I have no evidence regarding the detriment that [the child] would … have if the parental rights were terminated. The evidence indicates to me at this point that he's been in out-of-home care for 11 months; that the benefits of being in an adoptive permanent home outweigh any detriment. [¶] And again, I think at best [the child] would suffer minimal detriment if parental rights were severed, but it appears that the caregiver, the maternal aunt, is open to post-adoption contact; so at this time I do not believe that the parents meet either the second or the third prong and will follow the recommendations in the report."

The court proceeded to follow the department's recommendation and terminated the parental rights of mother and father and selected a plan of adoption for the child. Both parents filed a timely notice of appeal.

## DISCUSSION

### I. Beneficial Parent-Child Relationship Exception

Mother contends that the juvenile court erred when it did not apply the beneficial parent-child relationship exception to adoption. Mother argues that she met her burden to prove all three of the elements of the exception and the juvenile court relied on an improper factor.

#### A. *Legal Principles*

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained

11.

regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id*., subd. (c)(1)(B)(i).)

A parent claiming an exception to adoption has the burden of proof to establish by a preponderance of evidence that the exception applies. (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.) Thus, the parent must prove three elements in order to prevail under the beneficial relationship exception: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

The first element of the beneficial relationship determination asks the "straightforward" question of whether the parent visited consistently, considering the extent permitted by court orders. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The focus is on the best interest of the child as opposed to punishing or rewarding parents for good behavior in maintaining contact. (*Ibid*.)

The second element of the exception asks whether the child would benefit from continuing the relationship. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid*., quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The juvenile court's focus should again be on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C.*, at p. 632.)

When considering the third element, courts must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Potential negative effects from severance of the relationship might

include "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression." (*Ibid*.) An adoptive home might provide a new source of stability that alleviates emotional instability and preoccupation leading to those problems, making the loss "not, at least on balance, detrimental." (*Ibid*.) Under this element, the court is again guided by the child's best interest, but in a "specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid*.)

In *Caden C.*, the court held "that because the parent continued to struggle with substance abuse and mental health issues and because of the risks of foster care and benefits of the potential adoptive home, no reasonable court could find the child's relationship with his parent outweighed the benefits of adoption." (*Caden C.*, *supra*, 11 Cal.5th at pp. 625–626.) Rejecting that conclusion, our Supreme Court found "[t]he Court of Appeal did not explain how the parent's struggles related to the specific elements of the statutory exception: the importance of the child's relationship with the parent or the detriment of losing that relationship." (*Id*. at p. 626.) A parent's struggles with issues that led to dependency were determined to be relevant only to the extent they inform whether the child would "benefit from continuing the relationship and be harmed, on balance, by losing it." (*Id*. at p. 638.)

### B. Standard of Review

Appellate courts review a juvenile court's ruling on the application of the beneficial parent-child relationship exception using a "hybrid" standard. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) The substantial evidence standard applies to the first two elements of regular visitation and existence of a beneficial relationship. (*Id*. at pp. 639–640.) The juvenile court's decision as to the third element—whether termination of parental rights would be detrimental to the child—is reviewed for an abuse of discretion. (*Id*. at p. 640.) "Review for abuse of discretion is subtly different, focused

not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)

The standard of review of a court's determination that a parent did not meet his or her burden to prove an exception to termination of parental rights is "whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) Specifically, the question is "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.)

### C. Analysis

In the present case, the juvenile court determined that mother did not meet her burden of proof as to the application of the beneficial parent-child relationship exception. Mother contends that evidence was presented that would support a finding of the existence of a beneficial relationship between the child and mother that would outweigh the benefits of adoption. In support of her contention, mother cites to evidence that she had positive and affectionate interactions with the child during visits. While mother consistently visited the child, satisfying the first prong of the exception, she failed to identify any evidence which would compel a finding that termination of her parental rights would cause the child great harm.

The evidence before the court established that the child appeared to enjoy the supervised visits that occurred with mother twice per week from two months of age to thirteen months of age. However, evidence that the child had pleasant visits with mother is not enough to preserve parental rights. (See *In re Derek W.* (1999) 73 Cal.App.4th 823, 827 ["The parent must do more than demonstrate 'frequent and loving contact[,]'

14.

[citation] an emotional bond with the child, or that parent and child find their visits pleasant"].) Mother also cites to evidence that the child sometimes appeared upset at the conclusion of visits during the beginning of the case.

Mother's visitation with the child never progressed beyond supervised, and the testimony regarding more recent visitation indicated that the child had no difficulty separating from mother at the end of visits. Furthermore, there was no evidence that the child was suffering any type of emotional harm as a result of the limited interaction with mother over the past year in out-of-home placement. In fact, the department's report indicated that the child had been fully integrated into the relative care providers' family and appeared calm and happy with them. He was easily comforted, willingly went to them, and smiled while he was in their arms.

At such a young age, the child needed permanency and stability, which the relative care providers were willing and able to provide. The limited relationship mother was able to maintain through supervised visits in the several months that the child transitioned from a newborn to toddler in out-of-home care is not that extraordinary case where preservation of parental rights outweighs the preference for adoption. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166 [" ' "it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement" ' "].) Based on the present record, we cannot find that the court erred in declining to apply the beneficial parent-child relationship exception.

Mother also cites to the case of *In re M.V.* (2023) 87 Cal.App.5th 1155 (*M.V.*), in support of her contention that the juvenile court improperly relied on the relative care providers' willingness to allow post-adoption contact when it declined to apply the exception to adoption. In *M.V.*, the juvenile court acknowledged that the child wanted to remain in contact with her parents and live with both her parents and her relative care providers, and that she would be sad if she could not see her parents again. (*Id*. at p.

1184.) The court then moved on to the third, detriment element, before it "caught itself" and stated that there was clearly a bond with the child and parents. (*Id*. at pp. 1184–1185.) There was no further discussion about the beneficial relationship element of the analysis, which caused the appellate court to describe the analysis as "cursory," and state, "The court does not appear to have evaluated the quality of the parent-child relationships or to have considered factors such as M.V.'s age, how much of her life she spent in her parents' custody, the positive or negative effects of interaction with the parents, and M.V.'s particular needs. [Citation.] This was error." (*Id*. at p. 1185.)

In addition, the appellate court determined that the juvenile court improperly relied upon a bonding evaluator's opinion that adoption by relative care providers would keep the child's relationship with her parents intact because the relatives were willing to have an open adoption. (*M.V.*, *supra*, 87 Cal.App.5th at pp. 1173–1174, 1178.) The appellate court further explained that the bonding evaluator's "preference for adoption over guardianship rested on the legally untenable and factually questionable idea that adoption would leave M.V.'s relationship with her parents unchanged because the grandparents would permit continued contact with the parents. This is entirely the opposite of the legal effect of adoption." (*Id*. at p. 1181.) The appellate court held that "to the extent the court relied on the expectation of continued contact between M.V. and the parents after adoption, this was an impermissible consideration." (*Id*. at pp. 1185–1186.)

A similar claim was also considered in the case of *In re C.B.* (2010) 190 Cal.App.4th 102 (*C.B.*), which involved 9-, 10-, and 17-year-old children " 'of an age where they are intellectually and emotionally aware of whom their parents are.' " The juvenile court had implicitly found the existence of a "substantial, positive emotional parent-child attachment despite the lack of day-to-day contact." (*Id.* at p. 126.) However, it stated " '[t]here is no evidence that that [loving] connection [between mother and the children] would be severed if the Court were to terminate parental rights. The

16.

Court cannot see that terminating parental rights would "greatly harm" the children ….' " (*Id.* at p. 127.) Based in part on this belief, the juvenile court ultimately proceeded to terminate parental rights. (*Ibid.*)

The Court of Appeal found that the juvenile court erred by injecting an improper factor into the weighing process and concluded as follows,

> "[I]f a juvenile court determines that a parent has 'maintained regular visitation and contact' (§ 366.26, subd. (c)(1)(B)(i)), that there is a 'substantial, positive emotional attachment' between child and parent benefitting the child [citation], and that the benefit from continuing that parent-child relationship in a tenuous placement 'promotes the well-being of the child to such a degree as to outweigh' the benefit that child would gain from the stability and permanency of adoption [citation], then the parent-child relationship exception is established. In those circumstances, the court cannot nevertheless terminate parental rights based upon an unenforceable expectation that the prospective adoptive parents will voluntarily permit future contact between the child and a biological parent, even if substantial evidence supports that expectation." (*C.B.*, *supra*, 190 Cal.App.4th p. 128.)

Here, unlike the cases of *M.V.* and *C.B.*, we do not believe that the juvenile court ordered termination of parental rights on the expectation that there would be ongoing contact between the mother and the child. The juvenile court never found that there was a substantial, positive relationship between mother and the child. Furthermore, it made no express statement that there would be no severance of the parent-child relationship based on an agreement for postadoption contact. Nothing about the juvenile court's ruling indicated it had found sufficient evidence to support the existence of a beneficial relationship and then declined to apply the exception based on an unenforceable promise of future visitation.

The juvenile court made its comment regarding possible future contact after it had already concluded that the benefits of being in an adoptive permanent home outweighed any detriment. We draw all reasonable inferences in support of the juvenile court's order (*In re Megan S.* (2002) 104 Cal.App.4th 247, 250–251), and a reasonable inference from

17.

the record is that the juvenile court was merely commending the child's relative care provider as a digression during its weighty decision to terminate mother's parental rights. The court appeared to be expressing a positive note that mother might still be allowed to maintain contact in order to soften the blow of its forthcoming orders. The totality of the juvenile court's statements at the hearing makes clear that it decided to terminate mother's parental rights because she failed to meet her burden of proving the beneficial parent-child relationship exception.

In sum, the evidence in the record weighed in favor of the preferred permanency option of adoption. Given the fact that the child was only one year old, showed no distress when separating from mother, and was already comfortable with her relative care providers, we find the juvenile court did not abuse its discretion.[4] Under these circumstances, the juvenile court's ruling is entitled to a presumption of correctness, and remand is unwarranted. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) Therefore, the juvenile court did not err in declining to apply the beneficial parent-child relationship exception, and its orders terminating mother and father's parental rights were proper.

## II.     Due Process and Fair Hearing

Mother also asserts that the juvenile "precluded [her] from presenting the necessary facts to defend her parental rights." She contends that she was deprived of a fair hearing because the department only provided excerpts of visitation notes, she was not permitted to provide her own visitation notes, and the court did not observe a visit between her and the child.

### A.     *Legal Principles*

---

[4] We acknowledge that mother loves her son very much. It is clear that she made an effort to maintain her bond with him through the visitation that she was permitted to have during these proceedings. However, her ability to develop the type of relationship that could establish the exception was hindered once reunification services were denied and a section 366.26 hearing was set.

Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." (*Mullane v. Cent. Hanover Bank & Trust Co.* (1950) 339 U.S. 306, 314.) The juvenile court "is accorded broad general authority to control its proceedings." (*Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 758.) The juvenile court's discretion to control proceedings must be exercised consistent with due process. (*Lois R. v. Superior Court* (1971) 19 Cal.App.3d 895, 902 [parent has "right to the custody of her child," which "could not be deprived without an essential ingredient of due process, to wit, a fair hearing"].) A parent's due process right to present evidence in a dependency proceeding is limited to relevant evidence of significant probative value to the contested issues. (*Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138, 1147.)

### B.    Standard of Review

The trial court is vested with broad discretion in ruling on the admissibility of evidence. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 911.) We review juvenile court orders regarding the control of dependency proceedings and exclusion of evidence for abuse of discretion. (See *Ingrid E.*, *supra*, 75 Cal.App.4th at p. 753; see *In re Stephanie M.* (1994) 7 Cal.4th 295, 318 [court abuses discretion by " ' "making an arbitrary, capricious, or patently absurd determination" ' "].)

### C.    Analysis

Mother argues the juvenile court denied her a meaningful opportunity to be heard by limiting the evidence regarding her visitation with the child to excerpts of notes contained in the department's reports. We conclude she had ample opportunity to present her case, and she does not establish any abuse of discretion or due process violation.

First, the juvenile court did not prevent mother from introducing her own notes from visitation with the child. Mother testified at the disposition phase of the proceedings that she provided the department notes from her visits with the child's

19.

sibling, L.F., to demonstrate her parenting skills. At the section 366.26 hearing, mother was permitted to provide an offer of proof regarding her excuses for missing certain visits with the child over the course of the proceedings. However, she did not attempt to introduce any additional evidence or notes from her visits with the child. Her argument to the contrary is without merit.

Next, mother argues that the department only presented excerpts of visitation notes that were favorable to the department, which deprived her of a fair hearing. As mother did not object below to the adequacy of the adoption assessment, she cannot make these challenges on appeal. (*In re Urayna L.* (1999) 75 Cal.App.4th 883, 886 [waiver of issue of adequacy of adoption assessment].) Such a contention also fails on the merits because the excerpts of mother's visits did in fact provide favorable characterizations of mother's interactions with the child. The descriptions of mother's visits were primarily positive, and the juvenile court considered live testimony from one of the department's aides providing supervision of the visits. Mother was permitted to cross-examine the aide, and she did not seek to introduce any additional documentation from her visits. Thus, the juvenile court did not abuse its discretion in relying on the department's summaries of visitation between mother and the child.

Finally, we also reject mother's claim that the juvenile court erred when it denied her request to observe a visit between herself and the child. Mother made this request during closing argument for the contested disposition hearing. Her counsel requested that the juvenile court delay its decision on disposition to allow the court to personally observe a visit between mother and the child. The juvenile court denied the request because the evidentiary portion of the disposition hearing was closed, and the department had documented many visits between mother and the child. Similar to the section 366.26 hearing, there was also testimony regarding the positive nature of mother's visits with the

child.  Mother did not raise the denial of her request for observation in her previous writ petition, or at the section 366.26 hearing.

The forfeiture rule (often called the waiver rule), which precludes raising on appeal a challenge to any order entered in a prior hearing, as to which the time to appeal has expired, applies in all dependency cases "unless due process forbids it." (*In re Janee J.* (1999) 74 Cal.App.4th 198, 208 (*Janee J.*).)  The rule, embodied in section 395 and in section 366.26, subd. (l), promotes the "dominant concerns of finality and reasonable expedition" in dependency matters.  (*Janee J.*, at p. 207.)  With respect to "setting order[s]," i.e., orders setting a section 366.26 hearing, the rule also promotes the predominant interest of the child, at the late stages of the dependency, "preventing a sabotage of the process and preserving the legislative scheme of restricting appeals of final-stage termination orders." (*Ibid*.)  Section 366.26, subd. (l) precludes review of any issues decided at the setting hearing by any means other than a timely petition for extraordinary writ relief.  (§ 366.26(l)(1), (l)(2).)

In general, the forfeiture rule should be waived if two conditions are met.  First, there must be "some defect that fundamentally undermined the statutory scheme so that the parent would have been kept from availing himself or herself of the protections afforded by the scheme as a whole." (*Janee J.*, *supra*, 74 Cal.App.4th at p. 208.)  Lack of notice of writ review rights is one example of such a defect.  (*Id*. at pp. 208–209, citing *In re Cathina W.* (1998) 68 Cal.App.4th 716, 722–724.)  Second, the defects "must go beyond mere errors that might have been held reversible had they been properly and timely reviewed." (*Janee J.*, at p. 209.)

Here, the issue mother raises does not amount to a defect going beyond an ordinary error that could have been addressed in a timely writ petition.  Nor is it a defect that prevented mother from availing herself of the protections afforded by the dependency scheme as a whole.  The juvenile court clearly explained its reasons for

denying her request for court observation of a visit prior to ruling on disposition. Mother provided no rational explanation for her failure to timely challenge the juvenile court's prior ruling. Accordingly, there is no justification for waiving that requirement. (*Janee J.*, *supra*, 74 Cal.App.4th at pp. 208–209; see also *In re Dakota H.* (2005) 132 Cal.App.4th 212, 221–222 [failure to raise due process claim in lower court results in forfeiture].)

Based on the foregoing, we conclude the juvenile court did not abuse its discretion or violate mother's right to due process by excluding any relevant evidence at the section 366.26 hearing.

## DISPOSITION

The juvenile court's orders are affirmed.

SMITH, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


MEEHAN, J.

22.